**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ) | |
| ) | |
| **SANDRA NADINE CASSIDY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 12-30219-DJC** |
| ) | |
| **CAROLYN W. COLVIN,**[1] ) | |
| **Acting Commissioner,** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                 **March 27, 2014**

**I.      Introduction**

    Plaintiff Sandra Nadine Cassidy ("Cassidy") has brought this action for judicial review of

the final decision denying her claim for disability benefits, by Defendant Carolyn W. Colvin,

Acting Commissioner of the Social Security Administration ("the Commissioner"), issued by an

Administrative Law Judge ("ALJ") on November 14, 2011.  Before the Court are Cassidy's

motion for judgment on the pleadings to remand or reverse the ALJ's decision, D. 15, and the

Defendant's motion to affirm the Commissioner's decision, D. 23.  Cassidy argues that the ALJ

erred in denying her claim for Supplemental Security Income ("SSI") because the ALJ did not

provide sufficient reasoning for reducing the weight given to Cassidy's treating physicians'

---

[1] The Court substitutes Carolyn W. Colvin, Acting Commissioner of the Social Security
Administration, for Michael J. Astrue as the Defendant in this matter.  Fed. R. Civ. P. 25(d).

opinions and improperly discounted Cassidy's credibility when assessing her subjective reports of pain. D. 16. For the following reasons, the Court ALLOWS Cassidy's motion to vacate the ALJ's decision, REMANDS to the ALJ for further findings and/or proceedings consistent with this Memorandum and Order and DENIES the Defendant's motion to affirm.

## II.     Factual Background

Cassidy was 46 years old when she ceased working on November 1, 2009. R. 167.[2] She had previously worked as a waitress, cashier, housekeeper and food preparer and manager at a "large food chain." R. 148.

Cassidy filed claims for Social Security Disability Insurance ("SSDI") and SSI on March 31, 2010, asserting that she was unable to work as of November 1, 2009 because she was disabled by fibromyalgia, depression, panic disorder and a shoulder separation. R. 167.

## III.    Procedural Background

The SSA initially denied Cassidy's claims on July 15, 2010. R. 63–65. Cassidy requested reconsideration of her SSI claim only, which was denied on December 6, 2010. R. 69–71. On December 22, 2010, Cassidy filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 72–73. An ALJ conducted the hearing on October 12, 2011. R. 40. In a written decision dated November 14, 2011, the ALJ found that Cassidy did not have a disability within the definition of the Social Security Act and denied Cassidy's claims. R. 34. On November 22, 2011, Cassidy filed a request for review of the ALJ's hearing decision, R. 7, which was denied by the Appeals Council on October 19, 2012. R. 1. Accordingly, the ALJ decision is the final decision of the Commissioner. Id.

---

[2] Citations to "R." refer to the administrative record, D. 11.

## IV. Discussion

### A. <u>Legal Standards</u>

#### 1. *Entitlement to Disability Benefits and Supplemental Security Income*

To receive SSDI and/or SSI benefits, Cassidy must demonstrate she has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  The inability must be severe, rendering the claimant unable to perform any previous work or any other substantial gainful activity for which the claimant is qualified and exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505(a), 404.1511.

The SSA must follow a five-step sequential process to determine whether an individual has a disability for Social Security purposes and accordingly, whether that individual's application for benefits should be granted.  20 C.F.R. § 416.920.  If at any point during the process the SSA determines that the applicant is or is not disabled, it need not continue to the next step.  <u>Id.</u>  First, if the applicant is engaged in substantial gainful work activity, the applicant is not disabled.  <u>Id.</u>  Second, if the applicant does not have, or has not had within the relevant time period, a severe medically determinable impairment or combination of impairments, the applicant is not disabled.  <u>Id.</u>  Third, if the impairment or combination of impairments meets the conditions for one of the "listed" impairments in the Social Security regulations, the claimant is considered disabled.  <u>Id.</u>  Fourth, if the applicant's "residual functional capacity" ("RFC") is such that she can still perform past relevant work, she is not disabled.  <u>Id.</u>  Fifth, if the applicant,

given her RFC, education, work experience, and age, is unable to do any other work, the claimant is considered disabled.  Id.

2.      *Standard of Review*

This Court may affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  The ALJ's findings of fact are conclusive so long as they are supported by substantial evidence in the record.  42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (citations omitted).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citations omitted).  Therefore, if the ALJ made a legal or factual error, this Court may reverse or remand such decision with instruction to consider new material evidence or to apply the correct legal standard.  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation and quotations omitted); see also 42 U.S.C. § 405(g).

B.      **Evidence Before the ALJ**

Before the ALJ was extensive evidence regarding Cassidy's medical history, particularly the conditions upon which Cassidy relied in her application for SSI benefits – fibromyalgia,

shoulder separation and surgery, depression and panic disorder.  <u>See</u> R. 167.  The ALJ also found that Cassidy suffered the additional severe impairment of opiate dependence.  R. 14.

### 1. Medical History

#### a. Fibromyalgia

The first reference to Cassidy's fibromyalgia in the record appears to be on July 28, 2009, when Cassidy began care with a new primary care physician, Dr. Rebecca Caine, at the Hillcrest Family Health Center.  R. 687.  Cassidy reported that the pain from her fibromyalgia was worsening and that she had been having good days and bad days.  <u>Id.</u>  She also reported that she had been waitressing for years, but was forced to quit her job because of the pain.  <u>Id.</u> During her examination, Dr. Caine noted that Cassidy was "[d]iffusely painful with pain in all the fibromyalgia trigger points but also painful in all other areas as well."  R. 688.

On September 1, 2009, Cassidy reported to Dr. Caine that the pain had not improved, but that she was thinking about the pain less.  R. 690.  On September 25, 2009, Cassidy returned to Dr. Caine because she needed a doctor's note to excuse her from work.  R. 693.  During that visit, Cassidy reported that she was still experiencing "severe pain from fibromyalgia" and that she had stopped working because of the pain.  <u>Id.</u>

On November 2, 2009, Cassidy was treated by Dr. Mark Pettus at the Hillcrest Family Health Center.  R. 695.  Dr. Pettus noted that she had fibromyalgia.  R. 696.  On January 15, 2010, Dr. Pettus again noted Cassidy's reports of fibromyalgia and "chronic pain syndrome."  R. 697–98.  He also assessed her "chronic pain."  R. 698.  Cassidy had another follow up visit with Dr. Pettus on February 2, 2010, where Dr. Pettus again noted Cassidy's reports of fibromyalgia.  R. 699–01.

On March 5, 2010, Cassidy began seeing Dr. Christopher Trancynger at the Hillcrest Family Health Center. R. 702. There is no mention of Cassidy's fibromyalgia or any symptoms associated with her condition in the records of her visits to Dr. Trancynger on March 10, March 25, or May 6, 2010. R. 702–08. Cassidy's fibromyalgia is first mentioned in Dr. Trancynger's notes on September 2, 2010. R. 709. During that visit, Cassidy reported to Dr. Trancynger that her fibromyalgia was flaring up and that she was experiencing generalized muscle pain. Id. In his report, Dr. Trancynger noted that because of the fibromyalgia, he attempted to refer Cassidy to a rheumatologist, but the doctor was not taking new patients. R. 710. Dr. Trancynger provided Cassidy with a prescription to treat her fibromyalgia. Id. On November 18, 2010, Cassidy received treatment from Dr. Trancynger for a fibromyalgia flare up mainly in her right hip. R. 1332. Cassidy reported that she was experiencing worsening pain in her leg and arm and that she was interested in seeing a rheumatologist, but that she had been unable to get an appointment in Berkshire County. Id. In his assessment, Dr. Trancynger again noted the diagnosis of fibromyalgia and that Cassidy would make an appointment with the rheumatology clinic at the Baystate Medical Center. R. 1333.

On May 10, 2011, Cassidy was treated at the Berkshire Medical Center for pain in her lower back that was radiating into her left leg. R. 1339–40. Dr. George Deering ordered an ultrasound of her left leg and an x-ray of her lumbar spine. Id. The ultrasound of Cassidy's leg returned normal, but the x-ray of her lumbar spine revealed a "[f]aint sclerotic horizontal line through T12 body [that] may represent early osteoporotic fracture." R. 1340.

On May 13, 2011, Cassidy visited the Hillcrest Family Medical Center for a follow-up visit and was evaluated by Seth Katz ("Katz"), a nurse practitioner. R. 1337. During that visit,

Cassidy reported pain in her left thigh, groin and buttocks.  Id.  Katz examined Cassidy during the visit and noted tenderness in her spine.  R. 1341.

On June 13, 2011, Cassidy received follow up treatment with Dr. Trancynger, but he did not mention her fibromyalgia in his reports and noted that she reported that the pain in her leg had diminished.  R. 1402–03.

On July 5, 2011, Cassidy visited the Hillcrest Family Medical Center for a disability examination by Katz.  R. 1400.  During the evaluation, Katz noted that Cassidy had a history of fibromyalgia that affected "all of her body with constant pain."  Id.  After examining Cassidy, Katz completed disability forms for Cassidy and noted her diagnosis of fibromyalgia.  R. 1401.

### b.  Shoulder Separation and Surgery

On February 17, 2008, Cassidy was treated at Berkshire Medical Center by nurse practitioner Robyn Korte ("Korte") for a shoulder injury.  R. 1301.  She was referred by the emergency room to Dr. Kevin Mitts of Berkshire Orthopedic Associates for a consultation.  Id.  On February 25, 2008, Dr. Mitts examined Cassidy, reviewed the x-rays from her treatment at the Berkshire Medical Center and determined that she suffered an acromioclavicular joint separation in her left shoulder.  Id.  Dr. Mitts recommended reconstructive surgery on the joint and Cassidy agreed to undergo the surgery.  R. 1302.  Dr. Mitts performed the procedure on February 25, 2008 and Cassidy was released from the hospital two days later.  R. 1305.

On March 10, 2008, Cassidy had a follow up appointment with Dr. Mitts, where she reported that she was still experiencing pain; this time, however, Dr. Mitts noted that Cassidy appeared to be doing very well.  R. 1307.  On April 7, 2008, Cassidy reported Dr. Mitts that she felt a pop in her shoulder and believed that she re-injured it.  R. 1308.  Dr. Mitts ordered x-rays of Cassidy's shoulder, which showed a new fracture of the distal clavicle, but less severe than

before her surgery.  Id.  During the examination, Cassidy denied any recent trauma to her shoulder.  R. 1309.  Dr. Mitts informed Cassidy that she had a "recurrent deformity" but that it did not appear to be as severe as it was prior to surgery.  Id.

On April 29, 2008, Cassidy was treated in the emergency room at Berkshire Medical Center after a car accident and was again referred to Dr. Mitts.  R. 1310.  Dr. Mitts noted that the examination revealed a "limited active [range of motion] with forward flexion 90 degrees, internal rotation to the sacrum, and external rotation 45 to 60 degrees."  Id.  Dr. Mitts ordered x-rays and noted that there was no new damage to her shoulder from the car accident.  Id.

On June 5, 2008, Cassidy had a follow up appointment with Dr. Mitts.  R. 1312.  During that appointment, Dr. Mitts documented that Cassidy had a normal range of motion and that her pain appeared to be under control.  Id.  On July 28, 2008, Cassidy visited Dr. Mitts because she felt a pop in her shoulder while moving a dehumidifier in her basement.  R. 1314.  Cassidy claimed that she was experiencing a shooting pain down her arm.  Id.  Dr. Mitts ordered x-rays, but noted that there were no changes from the previous examinations.  Id.  When examining Cassidy, Dr. Mitts noted that she had a "limited active [range of motion] with forward flexion 90 degrees, internal rotation to the sacrum, and external rotation 45 to 60 degrees."  Id.  Dr. Mitts discussed with Cassidy the possibility of a second reconstructive surgery.  R. 1315.

> c.  *Opiate Dependence*

Cassidy's opiate dependence was noted by Dr. Subha Clarke of Wing Memorial Hospital on October 13, 2004.  R. 736.  Dr. Clarke noted that when reviewing Cassidy's medical chart, she noticed that Cassidy had been treated at the Community Substance Abuse Center with methadone for opiate dependency.  Id.  Previously, on February 3, 2000, Dr. Victor Acquista raised his concerns about Cassidy's use of Vicodin.  R. 743.  He recorded that while he was

treating Cassidy for back pain, she requested several Vicodin refills.  Id.  Dr. Acquista opined that he believed Cassidy was using the medication inappropriately because she sought several refills in a short period of time and she failed to follow through with physical therapy.  Id.

On May 23, 2008, Cassidy was admitted to the Berkshire Medical Center for withdrawals from prescription pain medications.  R. 421.  Cassidy acknowledged her addiction to prescription pain medications and discussed with the attending physician entering a detoxification program, but the hospital did not offer one and another facility that did have a program did not have space.  R. 419.  Cassidy was discharged from Berkshire Medical Center on May 24, 2008 with instructions to discuss reducing her pain medications with her primary care physician.  R. 419–20.

On September 17, 2008, Dr. Tamton Mustapa of Prime Columbia Greene Medical Associates in New York diagnosed Cassidy with opiate dependency and treated her with Suboxone.  R. 573–74.  Cassidy's medical records indicate that she remained on Suboxone until at least June of 2011.  R. 1348.  During this time, she had regular monthly follow up appointments with Dr. Mustapa until March 18, 2009, when she began seeing Dr. Charles Johnson at Prime Columbia Greene Medical Associates.  R. 595–98.

### d.    Mental Health Conditions

From 2008 forward, Cassidy was evaluated by several mental health professionals.  From February 13, 2008 to April 8, 2010, Cassidy received treatment from Valerie Trela ("Trela"), a psychiatric nurse practitioner.  R. 522-35.  On February 13, 2008, Cassidy reported trouble sleeping, depression and anxiety.  R. 522.  Trela diagnosed Cassidy with post-traumatic stress disorder ("PTSD") and anxiety and continued Cassidy's prescription for Klonpin.  Id.  She also prescribed Remeron.  Id.  Starting in May 2008, Cassidy began discussing her opiate addiction

with Trela and reported her chronic pain, dependence on prescription pain medications and her detoxification treatments sessions. R. 523-29. On March 11, 2009, Cassidy reported having nightmares and an increase in panic attacks, so Trela increased the dosage on her prescriptions. R. 530. On April 29, 2009, Cassidy reported that her symptoms were improving. R. 532. On October 7, 2009, again Cassidy reported an increase in panic attacks because of recent stress. R. 535.

2. *RFC Assessments and Other Evaluations by Massachusetts Disability Determination Services*

On February 16, 2010, Dr. Margaret Stephenson evaluated Cassidy for a disability. R. 228. During the evaluation, Cassidy reported "dysphoric mood, psychomotor retardation and a loss of energy, crying spells, feelings of guilt and feelings of hopelessness, psychomotor agitation and irritability, diminished self esteem, difficulty with concentration, and social withdrawal." R. 229. She also reported having nightmares, panic attacks and a dependence on prescription pain medications. Id. Dr. Stephenson noted that Cassidy "presented with depressive, anxiety, and panic symptoms." R. 230. Dr. Stephenson listed diagnostic impressions of major depressive disorder, PTSD, panic disorder without agoraphobia and opiate dependence. Id. She assigned Cassidy a Global Assessment of Functioning ("GAF") score of 50.[3] R. 231.

---

[3] "The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social and occupational functioning and refers to the level of functioning at the time of evaluation." Vazquez v. Astrue, No. 10–cv–30136, 2011 WL 1564337, at *1 n.1 (D. Mass. Apr. 25, 2011) (citing DSM-IV 32–33). "GAF scores in the 41–50 range reflect [s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." Warren v. Astrue, No. 10-cv-30053-MAP, 2011 WL 31292, at *1 n.3 (D. Mass. Jan. 4, 2011) (citing DSM–IV at 34) (quotations omitted).

On May 26, 2010, Dr. Ruth Aisenberg conducted a state agency assessment of Cassidy's condition. R. 536-49. Dr. Aisenberg noted that an RFC assessment was necessary because Cassidy had affective disorders, anxiety-related disorders and substance addiction disorders. Id.

On October 27, 2010, Dr. Stephenson evaluated Cassidy again. R. 723. During this evaluation, Cassidy reported many of the same symptoms that she reported during her February 2010 evaluation. R. 725. Cassidy reported that her most recent panic attack occurred three days earlier while she was shopping in the grocery store. Id. She told Dr. Stephenson that she believed her panic attacks occurred when she was around groups of people. Id. Dr. Stephenson noted that Cassidy "presented with depressive and anxiety symptoms." Id. Dr. Stephenson listed diagnostic impressions of depressive disorder, anxiety disorder and opiate dependency in remission. R. 726. She assigned Cassidy a GAF score of 55.[4] Id.

On November 16, 2010, Cassidy was evaluated by Elizabeth Young ("Young"), a licensed clinical social worker, R. 1328, at the Brien Center for Mental Health and Substance Abuse Services. R. 1317-30. During their meeting, Cassidy reported having panic attacks, anxiety and depression. R. 1317. Young's assessment focused on Cassidy's reported anxiety and depression. R. 1326. She noted that Cassidy exhibited the following symptoms of depression: "passive suicidal ideation, lack of motivation and lack of sexual drive, and fatigue." Id. She also noted that Cassidy's "social anxiety symptoms make her inappropriate for a group at this time." Id. Young diagnosed Cassidy with anxiety and assigned her a GAF score of 55. R. 1327.

---

[4] "GAF scores in the 51–60 range indicate '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'" Vazquez, 2011 WL 1564337, at *1 n. 1 (quoting DSM-IV 34).

On August 8, 2011, Dr. Tayyba Buttar ("Dr. Buttar") from the Brien Center conducted a psychiatric evaluation of Cassidy. R. 1418-21. Cassidy reported a history of opiate dependency, mood swings, PTSD and anxiety. R. 1418-19. Dr. Buttar diagnosed Cassidy with a history of PTSD, opiate dependence, anxiety disorder and mood disorder. R. 1420. She assigned Cassidy a GAF score of 55. Id.

Dr. Ruth Aisenberg, a state agency consultant, completed a mental RFC questionnaire on May 26, 2010. R. 550–53. Aisenberg noted that Cassidy was moderately limited in the following areas: (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods; (4) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform without an unreasonable number and length of rest periods; (5) ability to accept instructions and respond appropriately to criticism from supervisors; and (6) ability to respond appropriately to changes in work setting. R. 550-51. Based on these limitations, Dr. Aisenberg concluded that Cassidy could recall and carry out simple instructions. R. 552. Cassidy would be able to concentrate on "routine tasks for up to 2 hrs over an 8 hr span" but that her "work pace would be inconsistent." Id. The doctor noted that Cassidy would be upset by criticism and would be uncomfortable around male coworkers, but would be able to manage superficial interactions with men. Id. Finally, the assessment noted Cassidy would be able to adapt to routine changes. Id.

On July 13, 2010, Dr. S. Ram Upadhyay, a state agency consultant, completed a physical RFC assessment. R. 554-61. He noted that Cassidy could frequently lift and carry ten pounds, occasionally lift and carry twenty pounds, stand or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for a total of about six hours. R.

555. Dr. Upadhyay explained these limitations by citing Cassidy's fibromyalgia and left acromioclavicular shoulder joint separation. Id. While Dr. Upadhyay noted that he partially based his findings on an assumption that Cassidy was credibly reporting her symptoms, he found that it was reasonable to limit her to light exertion. Id. With respect to postural limitations, Dr. Upadhyay stated that Cassidy could only occasionally climb, stoop and crawl. R. 556. He further stated that Cassidy was limited in her ability to reach in all directions, including overhead. R. 557. Finally, he stated that Cassidy should avoid exposure to hazards, such as machinery and heights, because she was "less agile." R. 558.

On November 12, 2010, Cassidy was referred to Dr. Kautilya Puri, a state agency consultant, for an internal medicine examination. R. 718. Dr. Puri evaluated Cassidy's physical limitations due to her fibromyalgia. Id. Dr. Puri evaluated her gait with and without her prescribed cane and stated that he did not believe the cane was necessary. R. 719. He ultimately diagnosed her with fibromyalgia, depression and joint pain. R. 720. Based on his examination, Dr. Puri found that Cassidy had mild limitations in her ability to squat and reach overhead with her left hand. R. 720-21. He recommended that, in the short term, Cassidy refrain from lifting heavy objects with her left arm. R. 721.

On August 28, 2011, Dr. Trancynger completed a physical RFC assessment. R. 1406-11. At the time, Dr. Trancynger had been Cassidy's primary care physician for nearly one and one-half years and treated Cassidy on at least six occasions. R. 702, 705, 707, 709, 1332, 1402. Dr. Trancynger noted her diagnoses of PTSD, anxiety and fibromyalgia. R. 1406. He stated that her symptoms were pain in her lower back, neck, shoulders and legs and that her impairments could be expected to last at least twelve months. Id. He also stated that emotional factors contributed to the severity of Cassidy's symptoms and functional limitations. R. 1407. He identified

depression, anxiety and PTSD as psychological conditions affecting Cassidy's physical condition.  Id.  He noted that Cassidy could walk about two city blocks without rest or severe pain, sit for thirty minutes without needing to get up and stand for about fifteen minutes before needing to sit or walk around.  Id.  He recorded that Cassidy could sit for about two hours and walk or stand for less than two hours total in an eight-hour work day.  R. 1408.  Dr. Trancynger noted that Cassidy required the assistance of a cane when walking or standing, that she could rarely lift ten pounds or less and could never lift twenty pounds or more.  Id.  He found that she was limited to rarely twisting or stooping, never crouching, squatting or climbing ladders and occasionally climbing stairs or turning her head left or right.  R. 1409.  He also limited Cassidy to grasping, turning or twisting objects with her hands for one-half of an eight-hour day.  Id.  Finally, he noted that she could only reach overhead with her right arm for two hours out of an eight-hour day and never reach overhead with her left arm.  Id.  Dr. Trancynger stated that Cassidy's impairments would likely lead to good days and bad days and, as a result of her impairments, Cassidy likely would miss more than four days of work in a one-month period.  Id.

> 3. *ALJ Hearing*

At the October 12, 2011 administrative hearing, the ALJ heard testimony from Cassidy and vocational expert James Parker ("VE").  R. 40-60.

Cassidy testified that her medications made her drowsy and dizzy, causing her to sleep a lot and have dizzy spells.  R. 45.  She also testified that she had several surgeries, including wrist surgery, shoulder surgery, surgery to remove a tumor in her left breast and six surgeries to remove tumors from her cervix.  R. 47, 49.  Cassidy testified that she became dependent on pain medications because of her past surgical history.  R. 57.  Because she had undergone so many surgeries and been prescribed pain medications after each one, Cassidy testified, she eventually

developed a dependency on them.  Id.  She testified that when the doctors tried to wean her off the medications, she would become ill.  Id.  Finally, she testified that she had been undergoing treatment for her addiction since around 2009.  R. 58.

Cassidy stated that she could not maintain a full-time work schedule because of her widespread pain, panic attacks, inability to sit or stand for more than twenty minutes at a time and the side effects of her medications.  R. 51-52.

The VE responded to two hypothetical questions involving individuals of the same age, education and vocational background as Cassidy.  R. 53-56.  The first question, posed by the ALJ, was limited to light work and occasionally stooping, crawling, climbing ladders, ropes and scaffolds and avoiding frequent overhead reaching with her left arm.  R. 54.  The ALJ also limited the hypothetical to unskilled work by an individual who could maintain concentration, persistence and pace for about two hours and who had limited interaction with her coworkers and the general public.  Id.  The VE testified that such an individual would be capable of working in a light packing position, a bottle label inspector and an inserter.  R. 54-55.

The ALJ's second hypothetical was the same as the first, but added the inability to climb ladders, ropes or scaffolds.  R. 55.  The VE stated that the additional limitations would not change his opinion.  R. 56.  The VE further testified, however, in response to a question from Cassidy's attorney, that none of the hypothetical individuals would be able to find work if they were absent from work more than four days a month or could not show up for work five days a week.  Id.

### 4.    ALJ's Findings

Following the five-step process of 20 C.F.R. § 416.920, the ALJ found at step one that Cassidy had not engaged in substantial gainful activity since March 26, 2010.  R. 14.  At step

two, the ALJ found that Cassidy had the following severe impairments: fibromyalgia, left shoulder AC separation, depression, anxiety and opiate dependence. Id. At step three, the ALJ found that Cassidy did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 19. Cassidy does not dispute the ALJ's findings at steps one through three.

Before making her step four finding, the ALJ examined Cassidy's RFC. She determined that Cassidy:

> has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b) except no more than occasional stooping, crawling, climbing of ladders, ropes or scaffolds; no more than occasional overhead reaching with the left (non-dominant) arm; avoid concentrated exposure to hazards; limited to unskilled work; can maintain concentration, persistence, and pace for 2 hours at a time; no more than occasional interaction with co-workers and the general public; and limited to routine minor changes in the workplace.

R. 21. Having made this RFC finding, the ALJ concluded that Cassidy had no past relevant work but could perform light, unskilled work with no more than occasional stopping, crawling and climbing, could do no more than occasional overhead reaching with the left arm, should avoid concentrated exposures to hazards, could maintain concentration for two hours at a time and should have no more than occasional interaction with coworkers and the public. R. 21, 23. Cassidy disputes the ALJ's RFC assessment, D. 16 at 7-15, but does not otherwise dispute the ALJ's finding at step four.

At step five, the ALJ found that, despite Cassidy's physical and mental impairments, Cassidy could perform jobs that still existed in significant numbers in the national economy. R. 32. Cassidy disputes the finding at step five. D. 16 at 5.

## C.  Cassidy's Challenges to the ALJ Findings

Cassidy argues that the ALJ erred in limiting the weight assigned to Cassidy's treating physician's medical opinions.  D. 16 at 7.  While the ALJ was required by 20 C.F.R. § 416.927(c)(2) to give "good reasons" for any reduction in weight assigned to the treating source opinions, Cassidy argues that "the ALJ fails to make any specific reference to the evidence upon which her finding is based."  Id. at 8-9.  Additionally, Cassidy contends that "the overall longitudinal medical evidence, including records from treating sources, demonstrates the consistency of Cassidy's impairments . . . [which] was ignored," and that ignoring the evidence constitutes reversible error.  Id. at 10.

### 1.  The Court Cannot Conclude That There Was Substantial Evidence Supporting the ALJ's Decision

An ALJ's decision may be reversed or remanded when it is based on factual errors.  See Manso-Pizarro, 76 F.3d at 16; Borino v. Astrue, 917 F. Supp. 2d 166, 175 (D. R.I. 2013); Renaudette v. Astrue, 482 F. Supp. 2d 121, 132 (D. Mass. 2007).  Here, the Court remands to the ALJ because her decision appears to contain several "relevant and controlling factual errors" that may have impacted the ALJ's overall evaluation of Cassidy's claims.  Borino, 917 F. Supp. 2d at 175.

Ordinarily, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings."  Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  However, the ALJ's credibility determination is entitled to this deference only when it is supported by substantial evidence.  See id.; see also 42 U.S.C. § 405(g).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's]

conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Here, the Court cannot find that a reasonable mind, reviewing the record as a whole, could

accept the ALJ's evidence as adequate, particularly because the ALJ's decision relied in large

part on her determination that Cassidy was not credible.

First, the ALJ concluded that Cassidy was not credible, in part, because of "her

inconsistent reported work history (versus her insistence she was a 'workaholic')."  R. 25.  The

ALJ appears to have placed great stock in her conclusion that the "work history the claimant has

provided does not demonstrate a 'workaholic' personality," as "[m]ost positions were held for a

year or less and the details provided regarding the nature of the work are very vague."  R. 26.

The record, however, shows no indication that the ALJ asked Cassidy to expound upon what she

meant by this term before reaching the conclusion that Cassidy must have intended to mean

"substantial gainful activity."  See R. 25, 40–60.

Second, the ALJ found "drastic contradictions in the record, most significant the

claimant's complaints to doctors of fibromyalgia and other pain brought on by musckuloskeletal

impairments versus the completely benign findings from Dr. Charles Johnson's monthly

evaluations when refilling her Suboxone prescription."  R. 26.  In support of this proposition, the

ALJ noted that in July and September 2009, Cassidy reported several problems with

fibromyalgia to Dr. Caine, but in October 2009, did not report physical problems to Dr. Johnson.

R. 26, 628-630.  However, Dr. Johnson was treating Cassidy for her substance abuse, not

fibromyalgia, and Dr. Johnson's treatment notes suggest that his care was primarily for Cassidy's

Suboxone regimen.  R. 595-98; 632-34, 636-38, 642-44, 646-48, 651-53, 658-60, 663-65, 667-

70.  While the ALJ concludes that Cassidy's March 1, 2010 visit with Dr. Johnson was

"significant for addressing and documenting the claimant's complaints of cholecystitis"

(inflammation of the gall bladder), R. 26, the records reflect that Cassidy was still visiting Dr. Johnson for a Suboxone refill, but because of her gall bladder problems, Dr. Johnson suggested that Cassidy go see her surgeon before resuming care with Dr. Johnson. D. 646-48.

Third, the ALJ further stated that she was "disturbed by some of the more recent claims made by the claimant regarding her medical history." R. 27. The ALJ noted that Cassidy claimed a history of broken vertebrae in her lower back, but concluded these claims were not supported by any evidence in the record. Id. The ALJ specifically noted that when Cassidy underwent an x-ray of her lumbar spine, the findings only indicated "faint sclerotic horizontal line through T12 body may represent early osteoporotic feature." Id. (citing R. 1340). She also noted that the report did not mention a "fracture, dislocation, herniation, or evidence of surgical repair." R. 16. However, the report from Cassidy's x-ray stated in its findings section that "[t]here is a faint horizontal sclerotic line through the midbody of T12, may represent a nondisplaced fracture." R. 1340 (emphasis added). In addition, the report stated in its impression section that the "[f]aint sclerotic horizontal line through T12 body may represent early osteoporotic fracture." Id. (emphasis added).

Fourth, the ALJ also stated that she was "disturbed" by Cassidy's claim that she had undergone multiple hip surgeries. R. 27. However, as Cassidy clarified in her testimony before the ALJ, Cassidy was referring to the six surgeries she underwent to remove cancer. R. 49. Cassidy clarified that she was referring to these surgeries by saying "[n]ot hip, where they cut me from hip to hip." Id. The surgeries to which Cassidy was referring are documented in the record, R. 1243-70; still, the ALJ noted in her decision that none of the "claimant's medical records provided discuss such surgeries to her back or hips supporting these purely subjective complaints." R. 27. The ALJ found that given the "recentness of the complaints (made within

the last five months), and the fantasticalness of the alleged severity, the undersigned finds herself incredulous at the claimant's audacity." Id. The ALJ continued: "[t]hese statements combined with the inconsistencies noted above leave the undersigned no choice but to not accept anything the claimant says that is not verified through credible objective evidence." Id.

Fifth, the ALJ's conclusions unsupported by substantial evidence also extended to her assessment of Cassidy's mental health conditions. In evaluating Cassidy's claims of mental impairments, the ALJ provided "considerable weight [] to the observations and notes of Dr. Johnson," R. 31, including the purported indication in Dr. Johnson's records that Cassidy denied any "issues of anxiety, depression, or difficulty sleeping." R. 15. The ALJ concluded, Dr. Johnson "never observed [Cassidy] either depressed or anxious, and makes no reference to any mental difficulties." R. 29. The ALJ found this to be "significant considering what she has reported elsewhere and impacts the credibility of the severity of her condition." R. 31. However, the record reveals that on March 18, 2009, Dr. Johnson's assessed Cassidy's opiate dependence, anxiety and depression. R. 597.

Sixth, the ALJ also noted that "only up until very recently, has the claimant begun regularly having any documented psychological treatment" and that she "has not shown she has been treated for any of her psychological impairments." R. 29. The ALJ stated that Cassidy's psychological treatment began in late 2011, id., and found that Cassidy's lack of treatment history indicated that her psychological impairments were not severe enough to be debilitating. Id. However, the record reveals that from February 13, 2008 to April 8, 2010, Cassidy was receiving psychological treatment. R. 522-35; see R. 523-30 (Cassidy discussing her opiate addiction and her panic attacks).

The Commissioner argues that the "ALJ had ample reasons for giving little weight to Young's evaluation" of Cassidy, including that Young's report was an intake evaluation and that Cassidy's statements to Young about her education, substance abuse history and relationship "varied with other record evidence." D. 24 at 16. In affording "[l]ittle weight" to Young's opinion, R. 32, the ALJ concluded that there were "significant issues with regard to [Cassidy's] reporting." Id. The ALJ reasoned that Young relied on Cassidy's selective, self-reported information, observing that Cassidy did not report her history of drug abuse, abusive relationship or the sexual assault she reports to have suffered. Id. Young's notes, however, suggest that Cassidy did report these facts to Young. R. 1321, 1330.

### 2. *Treating Physician Opinions*

In light of Cassidy's arguments in support of her motion, the Court further notes that the ALJ, in considering whether the objective evidence supported her original RFC finding, must also adequately assess and explain whether the opinions of Cassidy's treating physicians are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record" and therefore entitled to "controlling weight." 20 C.F.R. § 416.927(c)(2). If the ALJ finds that the treating physicians' opinions should not be given controlling weight, she must assess the relevant factors as outlined in 20 C.F.R. §§ 416.927(c)(2)–(c)(6) and provide "good reasons" for the weight given. 20 C.F.R. § 416.927(c)(2). The Commissioner argues that the ALJ's decision to afford Dr. Trancynger's opinion little weight is supported by the lack of objective evidence in the record to support the opinion and that "[a]ny failure on the part of the ALJ to further articulate the reasons for giving Dr. Trancynger's opinion little weight does not warrant remand." D. 24 at 13–14. While the ALJ cited a number of the claimant's inconsistencies that may be supported by the

objective evidence, the Court cannot say that the discrepancies between the ALJ's written interpretation of the facts and an objective reading of the evidence amounted to "harmless error." See Hines v. Astrue, No. 11-CV-184-PB, 2012 WL 1394396, at *12 (D.N.H. Mar. 26, 2012). While the Commissioner argues that the ALJ "appropriately considered [Cassidy's] inconsistencies as part of the credibility analysis," D. 24 at 19, for the reasons discussed above, the Court cannot agree. The ALJ found that "because the claimant has failed to establish a correlation between her allegations and the objective medical evidence, the [ALJ did] not find the claimant entirely credible." R. 23. However, as discussed above, the ALJ based this determination, at least in part, on misstatement of evidence in the record. Accordingly, remanding this case for a reassessment of Cassidy's claims is an appropriate remedy.

### 3. Other Treating Source Opinions

Cassidy further argues that the ALJ should have given the opinions of other treating sources, namely Young, controlling weight. D. 16 at 11-15. The ALJ is not required to rely on evidence from sources such as nurse-practitioners, as "acceptable medical sources" who can "provide evidence to establish an impairment" are limited to (as relevant here) licensed physicians and licensed or certified psychologists. 20 C.F.R. § 416.913(a). "An administrative law judge, however, may not ignore 'other medical sources' or fail to adequately explain the weight given to such evidence." Taylor v. Astrue, 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (citing Social Security Ruling ("SSR") 06–03p, 2006 WL 2329939, at *3 (Aug. 9, 2006)). "In fact, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." Taylor, 899 F. Supp. 2d at 88 (quoting SSR 06–03p, at *5). The ALJ is not

required, however, to give "good reasons" for the weight assigned to these opinions but must only "adequately explain" her basis for the weight given. Taylor, 899 F. Supp. 2d at 88-89.

#### 4. *Subjective Allegations of Fibromyalgia Symptoms*

Finally, Cassidy argues that the ALJ erred in affording Dr. Trancynger's opinion little weight on the basis that she relied on Cassidy's subjective complaints of pain as opposed to credible objective evidence. D. 16 at 10. Cassidy is correct that "a patient's report of complaints, or history, is an essential diagnostic tool in fibromyalgia cases, and a treating physician's reliance on such complaints hardly undermines his opinion as to the patient's functional limitations." Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009) (citations, quotations and alterations omitted). Here, the ALJ asserted that she could not "accept the claimant at [her] word regarding her [pain] and limitations when presented with evidence that questions [her] credibility" and noted that she could not "blindly accept the opinion of a doctor (even a long treating one) without a certain amount of objective evidence that supports their conclusions." R. 22. Once the ALJ accepts a fibromyalgia diagnosis, however, she has:

> no choice but to conclude that the claimant suffer[ed] from the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms. . . . The primary symptom of fibromyalgia, of course, is chronic widespread pain, and the Commissioner points to no instances in which any of claimant's physicians ever discredited her complaints of such pain. Given this, we do not think that the ALJ's decision to discredit claimant was supported by substantial evidence.

Johnson, 597 F.3d at 414 (vacating and remanding to ALJ) (citations omitted). Here, the ALJ concluded that Cassidy suffered from fibromyalgia, R. 14, but did not follow this standard.

**VI.     Conclusion**

For these reasons, the Court ALLOWS Cassidy's motion for judgment on the pleadings, D. 15, VACATES the ALJ's decision and REMANDS this case for further findings and/or proceedings consistent with this Order.  The Court DENIES the Defendant's motion to affirm the Commissioner's decision, D. 23.

**So ordered.**

/s/ Denise J. Casper
United States District Judge